IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JANET A. JUDKINS,<br><br>    Plaintiff,<br><br>    vs.<br><br><br>JAY JENKINS, an individual; PLAIN CITY, a municipality,<br><br>    Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br><br>Case No. 1:12-cv-00020 DB-PMW<br><br>Judge Dee Benson |

    This matter is before the court on defendants' motion for summary judgment and plaintiff's cross motion for summary judgment. (Dkt. Nos. 45, 46.)  In her first amended complaint, Plaintiff Janet A. Judkins alleges seven causes of action against Plain City, Utah, and against the mayor of Plain City, Jay Jenkins.  (Dkt. No. 2-3.)  After the parties filed their respective motions for summary judgment, the court heard oral argument on November 7, 2013.  Plaintiff Judkins was represented by Elizabeth A. Knudson and David B. Stevenson.  Defendants Jenkins and Plain City were represented by Judith D. Wolferts.  Having considered the parties' briefs, oral argument, and the relevant law, the court enters the following Memorandum Decision and Order.

**BACKGROUND**

Plain City is a small town in Northern Utah with approximately 5,500 residents. It has a part-time elected mayor and a part-time city council consisting of five elected members. The city's offices are located in a two-story building. The first floor has a general-use area referred to as the senior center. The city's administrative offices are on the second floor.

Defendant Jay Jenkins was elected mayor of Plain City in 2005 and again in 2009. The relevant events in this case occurred in 2010 during his second term.

Plaintiff Janet Judkins began working part-time for the city in 1996 cleaning the senior center on an as-needed basis. (Dkt. No. 45, ¶ 1.) In 2005, she also began scheduling the senior center when someone wanted to use it. Id. at ¶ 2. This job consisted of taking bookings by telephone at her home and keeping track of the bookings in her own calendar. (Dkt. No. 55, ¶ 40.) She then contacted or visited someone at the city building's front desk who placed the information in the official scheduling book. Id.

In addition to her work for the city, Judkins worked part-time for the Weber County school district as a driver for special needs children. Id. at ¶ 64. She worked at least 20 hours per week for the district, usually three days per week—from 6:15 a.m. to 9 a.m. and from 12:00 p.m. to 4:15 p.m. Id. Additionally, she never worked at her school district job on Tuesdays because she tended her grandchildren every Tuesday from 9 a.m. to 5 p.m. Id. at ¶ 66.

In January, 2010, council member Brett Ferrin began supervising Judkins and the use of the senior center—a duty previously performed by fellow council member LaFray Kelley. Soon after replacing Kelley, Ferrin learned that some employees who used the senior center were not paying the required $25 fee. Id. at ¶¶ 69, 72. Ferrin raised this issue during the regularly scheduled city council meeting on January 21, 2010, but did not mention the names of any

potential offending employees. The council decided to table the matter until its work meeting later that evening where it would discuss budget and facility issues. During the work meeting, Ferrin again raised the fee issue and the council decided that it needed to create a clear policy on fees for using the senior center. However, the council agreed to first consult the relevant policies of neighboring cities before doing so.[1]

Following the work meeting, Mayor Jenkins went upstairs with the city recorder, Diane Hirschi, to review the city's records to see who had not been paying. Id. at ¶ 85. They examined the records and Jenkins learned for the first time that he was one of the persons identified as not paying. He had believed that he, as mayor, did not have to pay. Id. at ¶¶ 79–80. He also saw that two other city employees had not paid to use the center. Id. at ¶ 86.

Jenkins and Hirschi then discussed a second concern that Ferrin had raised during the evening's meetings. Id. at ¶87. Ferrin was concerned about the existing scheduling process for using the senior center. Id. at ¶ 74. He believed that it was problematic because there were two sets of schedules: one was kept and updated by plaintiff Judkins, and the other was kept at the city building's front desk. Because of the separate schedules, sometimes there had been problems in coordinating the two when either Judkins or the front desk would schedule an activity without informing the other. On a rare occasion, maybe once or twice, there had also been a problem coordinating the receipt of payments as well as coordinating the distribution of keys. Id.

After this conversation with Hirschi, Jenkins decided to reassign Judkins' scheduling and cleaning duties to others. Id. at ¶¶ 88–89. On the following morning, January 22, 2010, he drafted a letter to Judkins and hand-delivered it to her at her home. Id. at ¶ 91. Upon delivering

---

[1] For example, the Council planned to look to neighboring cities to see how they treated city-sponsored events or events involving non-profit organizations. (Dkt. No. 45-14, p. 3.)

the letter, he told her, "We've made some changes in the city. We just thought you'd want to

know." On the bottom of the letter he had written, "Janet, thanks for your past service. Mayor

Jenkins." He also wrote that the changes would be effective three days later, on the following

Monday. Id. The type-written portion of the letter stated:

> Effective Jan. 25, 2010, Plain City will be making some changes as to the
> scheduling [sic] the building, including the senior center. From now on,
> scheduling for use of the entire building will be done at the front desk and they
> will collect the rental funds when they are appropriate
> In coordination with the scheduling changes, we will be changing
> procedure in regards to cleaning. We will now have the firm that does the
> cleaning for the upstairs of the building include the downstairs portion of the
> building also.
> We are excited about the changes that will streamline the process and also
> eliminate confusion in the future.

Id. at ¶ 89. According to the letter, the front desk at the city building would begin doing

all of the scheduling, and M&V Maintenance, the company that already cleaned the

upper level of the city building, would begin cleaning the senior center as well. Id. at ¶ 4.

In his deposition, Jenkins testified that he had conferred with Hirschi in drafting the letter

and that his goal was to eliminate the problems discussed in the previous evening's

meetings. Id. at ¶ 88.

Before M&V took over cleaning the entire building, a male employee from the

public works department, Dusty Palmer, cleaned the senior center. Id. at ¶¶ 100, 182,

185. Although neither party specifies how long Palmer worked in this capacity, it

appears he cleaned the center as needed from the end of January, 2010, to July of the

same year. Id. In a letter sent to the Utah Antidiscrimination Division (the "UALD") in

July, the city attorney explained that M&V had already taken over and that Palmer's only

function had been to clean the center during the transition period before M&V could

adjust its cleaning schedule. Id.

### a. Judkins' First Appeal

On February 1, 2010, Judkins filed an appeal with the city. Id. at ¶ 106. According to Judkins, the grounds for her appeal were that "they did not follow the policies outlined in the Plain City Administrative Policies and Procedures." Id. at ¶ 109.

After she filed her appeal, the city attempted to negotiate and at one point offered to allow her to retain her cleaning job. In an email to Brett Ferrin on February 16, Judkins said she did not want to negotiate, and that "I think it would be best of all, if from now on we go through the proper procedures. I feel like I'm not doing this just for myself, but for all other city employees and citizens." Id. at ¶ 111.

Because the city had never had an employee appeal before, the council had to compose an employee appeals board as required by city ordinance 3.1.150(f).[2] In compliance with the ordinance, the council soon adopted another ordinance for choosing the five members of the appeals board. This ordinance was enacted on March 4, 2010, and named, "Establishing Procedures to Form a Discharge Appeal Board and Establishing an Effective Date." Id. at ¶ 116. The ordinance stated that two of the appeals board members were to come from among city council members and that three were to come from among city employees. Id. at ¶ 117. The

---

[2] Section 3.1.150(f) states,

> the appeal board . . . shall consist of five members, three of whom shall be chosen by and from employees and two of who [sic] shall be members of the governing body." It goes on to say, "[t]he method and manner of choosing members of the appeal board, and designation of their terms of office shall be prescribed by the governing body by ordinance, but the provisions for choosing the three members from the appointed officers and employees shall in no way restrict a free selection of members by the appointive officers and employees of the municipality.

(Dkt. No. 55, ¶ 115.)

mayor would choose the two city council members, and the city employees would choose the other three.  Id.  Additionally, the two members chosen by the mayor required the advice and consent of the council.  The mayor chose council members Brent White and Bruce Higley.  The three members chosen by city employees were Nancy McKeller (school crossing guard), Hal Van Meeteren (volunteer fire department), and Brandie Kilts (volunteer fire department).  Id. at ¶ 117–119.

The appeals hearing was held on March 24, 2010.  Judkins testified that she received notice of the March 24 hearing and that she had sufficient time to prepare for it.  Id. at ¶¶ 121–22.  She also testified that she knew that she could have had an attorney represent her at the hearing, although she chose not to.  Id. at ¶ 123.  She was allowed to speak at the hearing, but chose to present a written statement instead, which her son read on her behalf.  Id. at ¶ 128.  At the end of this statement, she urged the board "to remember that they are to decide whether or not the policies and procedures were followed.  It's not a matter of whether Janet was fired, but whether the procedures were correctly followed."  Id. at ¶ 161.

The appeals board voted four to one to uphold Judkins' dismissal.

### b.  Judkins' Second Appeal

Following the appeals board's decision to uphold Judkins' dismissal, she filed a second appeal.  This second appeal was to be heard directly by the city council, which would decide whether or not to uphold the appeals board's vote.  (Dkt. No. 55, ¶ 115.)  During this same period, Judkins also filed a Charge of Discrimination with the Utah Antidiscrimination Division (the "UALD") claiming discrimination based on age, sex, and retaliation.  (Dkt. No. 45-28.)

Given the pendency of the UALD's decision, the city council decided to postpone hearing the second appeal until after the UALD had resolved Judkins' Charge of Discrimination.[3]

On July 11, 2011, the UALD issued a decision on Judkins' Charge of Discrimination. It found "no cause" to believe there had been age discrimination, gender discrimination, or retaliation. Judkins did not appeal the UALD's decision. The Equal Employment Opportunity Commission (the "EEOC") affirmed the UALD's decision on October 4, 2011, and issued Judkins a right to sue letter. The letter informed Judkins that she had ninety days from receipt of the letter to file a lawsuit.

Having received both the UALD's and EEOC's decisions, the city council then voted on Judkins' second appeal on October 6, 2011. The initial vote was a tie. Council members Ferrin and White voted to uphold the appeals board's decision, and council members Kelley and Higley voted to reverse it. Paul Hodson, the fifth and newest member of the city council, abstained because he did not feel he had enough information. Id. at ¶ 204. As a result, the council voted to table the decision until its next meeting so that Hodson could become better informed on the matter. Id. at ¶ 207. On November 3, 2011, they voted again, but this time the vote was four to one: four votes to uphold the appeals board's decision (Ferrin, White, Higley, and Hodson) and one to reverse it (Kelley).

On November 1, 2011, just two days before the council's final decision on the second appeal, Judkins moved forward with her lawsuit by submitting copies of a notice of claim to both the city and Jenkins as required under the Utah Governmental Immunity Act ("UGIA"). Id. at ¶ 212. See Utah Code Ann. § 63G-7-401. She then filed a complaint in Utah's Second

---

[3] Jenkins and council member Brent White both testified that the city attorney advised the council to postpone the second appeal.

District Court.  (Dkt. No. 2-3.)  Defendants thereafter removed the case to this court.  (Dkt. No. 2.)

## DISCUSSION

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party.  Id.  However, where, as here, there are cross motions for summary judgment, the reasonable inferences drawn from affidavits, attached exhibits, and depositions are rendered in the light most favorable to the non-prevailing party.  Jacklovich v. Simmons , 392 F.3d 420, 425 (10th Cir. 2004).  Furthermore, "[w]hen the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts."  Atlantic Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotation marks omitted).  In this case, the material facts are not in dispute.

## I.  THE UTAH PROTECTION OF PUBLIC EMPLOYEES ACT CLAIM

### a.  Judkins Did Not Meet the 180-day Statute of Limitations

Judkins' first cause of action alleges a violation of the Utah Protection of Public Employees Act (the "UPPEA").  See Utah Code Ann. §§ 67-21-1, et seq.  Judkins claims that Mayor Jenkins terminated her in retaliation for reporting that he had used the senior center without paying the required fee.  (Dkt. No. 2-3, ¶ 35.)  Before reaching the merits of a UPPEA claim, however, the court must first be satisfied that the plaintiff has met the procedural

requirements under the act. Under the act, both the plaintiff's complaint and notice of claim must be filed within 180 days "after the occurrence of the alleged violation." Utah Code Ann. § 67-21-4 (2011). The parties disagree on when this 180-day limitations period began.

Judkins claims that the period began on November 3, 2011—after the end of her second appeal. To support this claim, she relies on recent amendments to the UPPEA, which changed the act so that, in certain instances, the 180-day period does not begin until after the claimant has "*exhausted administrative remedies*." See Utah Code Ann. § 67-21-4(1)(b) (2013) (emphasis added).

Conversely, defendants assert that the 2013 amendments are inapplicable and that the court should apply the 2010 version of the act, which states that the limitations period begins "after the occurrence of the *alleged violation.*" See Utah Code Ann. § 67-21-4 (2010) (emphasis added). The date of the "alleged violation" under this version of the act would be January 22, 2010, the date Judkins claims her employment was terminated.[4] Thus, using the 2010 version of the act, Judkins UPPEA claim would be barred because she failed to file both her complaint and notice of claim within 180 days of January 22, 2010.

---

[4]     The 2010 version defines the date of the "alleged violation" as the date the employer took an "adverse action" against the employee. An "adverse action" means "to discharge, threaten, or otherwise discriminate against an employee in *any manner that affects the employee's employment.*" Utah Code Ann. § 67-21-2 (2010) (emphasis added). Accordingly, January 22, 2010 is the date of the "adverse action," and hence the "alleged violation," because it is the date when the employer, Mayor Jenkins, acted in a way that affected Judkins' employment; i.e., it is the date he hand-delivered Judkins the letter that effectively removed all of her duties.

Notably, although there is some disagreement about when she was technically "terminated," neither party disputes that after this event Judkins' duties changed significantly. And although not dispositive, it is telling that Judkins herself repeatedly characterizes Jenkins' actions on this date as the retaliatory "adverse action." See e.g., (Dkt. No. 2-3, ¶ 12): "Plaintiff was terminated of her employment duties and/or received a change of duties on January 22, 2010 (hereinafter referred to as 'adverse employment action')"; (Dkt. No. 45-4, p. 7) (where Judkins testified that she believed she was terminated as of January 22, 2010).

The court finds that the 2010 version of the act is applicable and that Judkins' UPPEA claim is barred by the 180-day statute of limitations. As a general rule, a court should apply the version of the act that was in effect at the time of the events giving rise to the suit. See Harvey v. Cedar Hills City, 227 P.3d 256, 259 (Utah 2010). Here, the version of the UPPEA in effect at the time of the events giving rise to Judkins' claims was the 2010 version. Although it is not uncommon for amendments to be applied retroactively, it is not appropriate here because, according to controlling Utah law, once a limitations period has passed, a civil "defendant has a vested right to rely on the limitations defense, which right cannot be rescinded by subsequent legislation extending a limitations period." See Lusk v. Lusk, 37 P.3d 1103, 1110 (Utah 2001). Here, defendants had a vested right to rely on the limitations defense because the 180-day period under the 2010 version had long since passed by the time the act was amended in 2013.

Notwithstanding, Judkins still claims that the act should be interpreted to mean that the date of the "adverse action" was when she exhausted her administrative remedies. The court finds no merit to this claim. There is a general presumption that "when [the Legislature] alters the words of a statute, it must intend to change the statute's meaning." United States v. Wilson, 503 US 333, 336 (1992). In 2013 the Utah legislature added the language regarding the exhaustion of administrative remedies. The 2010 law cannot be read to mean what it did not say.

**b. Even Assuming That the Date of the Adverse Action Was the End of the Appeals Process, the Statutory Requirements Were Still Not Met**

Even if the court accepted Judkins' argument that the 180-day period did not begin until after November 3, 2011, her UPPEA claim still fails because she did not follow the requirements of the UGIA.

The UGIA establishes certain requirements that a plaintiff must follow in making a claim against a governmental entity or employee, including claims made under the UPPEA. In

particular, the UGIA states that a claim against a governmental entity or employee "is barred unless notice of claim is filed . . . *after* the claim arises."  Utah Code Ann. § 63G-7-402. (emphasis added).  A claim arises "*when the statute of limitations that would apply if the claim were against a private person begins to run*."  Id., § 63G-7-401. (emphasis added).  In this case, if the court assumes that Judkins is correct that the limitations period did not begin until November 3, 2011, when she exhausted her administrative remedies, her claim under the UGIA would also have arisen on that date.  Therefore, because a claim against a governmental entity or employee is "barred unless notice of claim is filed . . . *after* the claim arises," Judkins violated the UGIA by filing her notice of claim on November 1, two days *before* her claim under the UGIA had arisen.  Although this is only a difference of two days, the Utah Supreme Court has said that any conditions placed on rights granted under the UGIA "must be followed precisely." Hall v. Utah State Dep't of Corr., 24 P.3d 958, 965 (Utah 2001); see also, Mecham v. Frazier, 193 P.3d 630, 634 (Utah 2008) ("Utah courts require strict compliance with the notice of claim requirement of the UGIA.").  Accordingly, even if the court were to accept Judkins' argument that the statue of limitations did not begin to run until after she had exhausted her administrative remedies, her UPPEA claim would still be barred.

## II.    THE 42 U.S.C. § 1983 CLAIMS

### a.  "Property Interests"

Section 1983 of Title Forty-Two of the United States Code does not create any substantive rights.  Gallegos v. City & County of Denver, 984 F.2d 358, 362 (10th Cir.1993).  It merely provides a remedy when someone is deprived of the rights, privileges, or immunities secured by the United States Constitution or federal law.  Id.  To validly claim a deprivation of either procedural or substantive due process, a plaintiff must first show that there was a

deprivation of an interest encompassed by the Fourteenth Amendment's protection of liberty and property. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 569 (1972). A "property interest," of the kind encompassed by the Due Process Clause, is defined as "a legitimate claim of entitlement to some benefit," as opposed to a mere "abstract need or unilateral expectation." Teigen v. Renfrow, 511 F.3d 1072, 1078-79 (10th Cir. 2007). Such property interests are not created by the Constitution, but "are created and their dimensions are defined by existing rules and understandings that stem from an independent source," which can, in appropriate circumstances, include "state statutes, municipal charters or ordinances, and express or implied contracts." See Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000); Kingsford v. Salt Lake city Sch. Dist., 247 F.3d 1123, 1128 (10th Cir. 2001).

### i. *Property Interests in Continued Employment*

Accordingly, before an employee of a city, such as the plaintiff in this case, can claim a deprivation of due process, she must first show that she possessed some sort of protected property interest. Board of Regents, 408 U.S. at 577. In the employment context, the United States Supreme Court has defined such a property interest as requiring a legitimate expectation in "continued employment." See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538, (1985). An entitlement to continued employment only arises when the local "rules or mutually explicit understandings" place "substantive restrictions on a government actor's discretion to make personnel decisions," such as when a city's policies specify that an employee can only be terminated for cause. See Perry v. Sindermann, 408 U.S. 593, 601 (1972); Hennigh v. city of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998). In other words, a "for cause" requirement places a substantive restriction on the employer's discretion to dismiss the employee, and the employee therefore has a legitimate claim of entitlement to continued employment unless such

cause is shown.  See Kingsford, 247 F.3d 1123 (holding that the plaintiff did not have a property

interest in his continued employment because there was no implied agreement that he could only

be terminated for cause); Lighton v. Univ. of Utah, 209 F.3d 1213, 1221 (10th Cir. 2000) (noting

that because the plaintiff was an at-will employee and could be terminated at any time for any

reason, he had no property interest in his continued employment).

      1.  Judkins Did Not Have a Property Interest In Her Continued
          Employment.

In this case, it is undisputed that Judkins was an at-will employee and therefore did not

have a property interest in her continued employment.  Plain City's Code does not place any

substantive restrictions on the decision to dismiss a part-time city employee, nor does it create an

agreement, explicit or implicit, that Judkins could only be fired for cause, and Judkins apparently

never makes this claim.[5]

---

[5]    Although Judkins mentions the idea of an implied agreement in her briefing, (see Dkt.
No. 55 p. 125.), she stops short of claiming there was an agreement that she could only be fired
for cause.

    Even assuming that Judkins had pled such an implied contract, her claim would still fail
because the Utah Code prevents her from having a property right in her employment.  Utah Code
sections 10-3-1105 and 1106 expressly prohibit part-time municipal employees from having a
property right in their employment.  Normally, when local policies conflict with state statute,
local policies must give way.  The rights of public employees, like Judkins, "generally spring not
from contract, but from legislative policy," see Code v. Utah Dept. of Health, 174 P.3d 1134
(Utah Ct. App. 2007), and the Utah legislature has established a policy that part-time municipal
employees do not have a property right in their employment.  An employee's rights "must be
consistent with the underlying statutes," and a municipal code cannot "alter or contradict an
employee's statutory rights."  Id. at 1136.  Thus, even though state-law sources for property
rights may include "statutes, municipal charters or ordinances, and express or implied contracts,"
Kingsford, 247 F.3d at 1128, such sources are subordinate to the clear intent of the state
legislature.  Notably, Plain City's Code even prohibits a contrary result.  According to the
relevant provision, "[n]othing in this chapter or in the regulations developed pursuant to this
Chapter shall be construed as contrary to any Federal or State law, regulation or requirement, or
with any contract entered into by the City."  PC ¶ 3.1.060. (emphasis added).

    Plain City's Code states, "An employee shall be considered a part-time employee for
purposes of this Chapter if his employment *normally requires an average of less than thirty-five
(35) hours per week.*" (Dkt. No. 46-16, PC 3.1.040(i)) (emphasis added).  Judkins never claims
that she was a full-time employee, nor does she dispute the facts that clearly support the opposite

As will be addressed more fully in the next section, Judkins never explicitly explains the property interest that serves as the basis for her Section 1983 claim. She makes numerous conclusory references to continued employment cases,[6] which are unhelpful because Judkins apparently does not rely on this theory. In any event, to the extent her Section 1983 claim is based on entitlement to continued employment, it fails.

### ii. Other Protected Liberty or Property Interests

Because Judkins did not have a property interest in her continued employment, her asserted interest protected by Section 1983 necessarily must lie elsewhere. From Judkins' briefing and oral argument, the precise nature of Judkins' alleged liberty or property interest is not entirely clear. It appears, however, that her claim generally rests on her contention that defendants violated various provisions of the Plain City Code by the way they handled the termination of her custodial and scheduling duties, and the appeals process that followed. (Dkt. No. 46, pp. 16–19.) This is consistent with her written statement that was read aloud by her son at the first appeal, in which she urged the board "to remember that they are to decide whether or

---

conclusion. For example, she admits to working 20 hours a week at another job, (Dkt. No. 45-4, pp. 63, 69), and that she tended her grandkids from 9 a.m. to 5 p.m. every Tuesday. Id. at 81–82. She also does not dispute that in some months she might only clean the civic center for about eight to ten hours. Id. at 143.)

[6]    See (Dkt. No. 46, p. 31; Dkt. No. 55, p. 77–78): (Lighton v. Univ. of Utah, 209 F.3d 1213, 1221 (10th Cir. 2000); Wasatch Pedicab Co., LLC v. Salt Lake City Corp., 2008 WL 2224830 (D. Utah May 27, 2008); Hennigh v. City of Shawnee, 155 F.3d 1249, 1253 (10th Cir. 1998); Carnes v. Parker, 922 F.2d 1506, 1510 (10th Cir. 1991); Dickeson v. Quarberg, 844 F.2d 1435, 1439 (10th Cir. 1988); Kingsford v. Salt Lake City Sch. Dist., 247 F.3d 1123, 1128 (10th Cir. 2001)).

Additionally, the Kingsford case, which Judkins relies on heavily, is equally inapplicable because the plaintiff in Kingsford did not rely on a municipal charter or ordinance, and unlike Judkins here, he claimed there was an implied agreement that he could only be fired for cause. Notably, the court still concluded that he did not have a property interest.

not the policies and procedures were followed.  It's not a matter of whether [she] was fired, but whether the procedures were correctly followed."  Id. at ¶ 161.

In her briefing, Judkins makes a long list of defendants' actions that allegedly violated the Plain City Code.  Id.  Of these, Judkins appears to focus on one provision in particular.  She claims that Mayor Jenkins violated the Code when he terminated her employment without doing so in conjunction with the city council.  The relevant provision of the Code states, "[t]he Mayor *and* city council by majority vote are the only persons authorized to dismiss an employee."  See PC 3.1.150(e); (Dkt. No. 46-14, p. 3.) (emphasis added).[7]

### 1. Mayor Jenkins' Unilateral Action.

The United States Supreme Court has been clear that "property cannot be defined by the procedures provided for its deprivation."  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 105 S. Ct. 1487, 1493, 84 L. Ed. 2d 494 (1985).  A municipality's procedures must establish a legitimate claim of entitlement to some benefit, but the benefit must be beyond a right to the procedural protections themselves.  See Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000).  Procedural protections alone cannot create a protected property right because "the categories of substance and procedure are distinct.  Were the rule otherwise, the [Due Process] Clause would be reduced to a mere tautology."  Loudermill, 470 U.S. at 541; see Asbill v. Hous. Auth. of Choctaw Nation of Oklahoma, 726 F.2d 1499, 1502 (10th Cir. 1984).

Accordingly, Judkins' Section 1983 claim fails to the extent it is based on the Mayor's alleged violation of the ordinance because Judkins cannot identify a basis for her property interest that is independent of the procedural defect based on that ordinance.  Judkins' claim is not that she couldn't be dismissed from her job, it is only that her dismissal was not performed

---

[7] Although not relevant to the present discussion, this provision is ambiguous because it is not clear whether the mayor, acting alone, is authorized to terminate a city employee's employment.

correctly because the mayor acted alone. The provision clearly relates to the mayor's termination authority as opposed to the substance of the termination decision. Viewed this way, the disputed provision, at best, constitutes an independent source supporting a claim of entitlement to the protection itself, but not to an underlying property interest sufficient to merit the protection afforded by Section 1983. See Fleury v. Clayton, 847 F.2d 1229, 1231 (7th Cir. 1988) ("There is no good reason to treat as a constitutional wrong every error in the administration of state discipline.").

  *iii. Even If Judkins Had a Property Interest, She Would Still Need to Show That the Code Was Violated.*

Even if the court assumed that Judkins' 1983 claim was properly based on the way in which the mayor unilaterally terminated her employment, Judkins would still need to show that the provision was violated. First, this presents a question of law regarding the proper construction of the provision. See Hyde Park, 226 F.3d at 1210 (where the plaintiff's entitlement analysis was a matter of statutory construction deciding whether a local city council had violated its own ordinance in denying plaintiff's zoning application). Under these circumstances, it is Judkins' task to show that the mayor had no discretion to unilaterally terminate her, "otherwise, the city's decisionmaking lacks sufficient substantive limitations to invoke due process guarantees." Id.

Turning again to the provision, it states, "[t]he Mayor *and* city council by majority vote are the only persons authorized to dismiss an employee." See PC 3.1.150(e); (Dkt. No. 46-14, p. 3.) (emphasis added). The "and" in this provision creates an ambiguity. Judkins claims the provision means that the mayor and city council must act in conjunction to dismiss an employee. Defendants claim it means that either the mayor *or* the city council are authorized to independently dismiss an employee.

If required to interpret the provision, the court would find that the record evidence does not support Judkins' proposed interpretation. Rather, the evidence presented suggests the opposite—that the Code gives both the mayor and the city council the independent authority to dismiss an employee. Mayor Jenkins, council member Brent White, and city recorder Diane Hirschi all submitted declarations explaining their belief that the mayor had the power to unilaterally dismiss an employee. (Dkt. No. 55, ¶¶ 19–21.) According to the Code, all "administrative powers, authority and duties are vested in the mayor," and the mayor is "the chief executive officer to whom all employees of the city shall report." Id. at ¶¶ 8, 11. The disputed provision, read together with this provision and the above testimony, appear to give the mayor the authority to unilaterally dismiss city employees. Furthermore, when Judkins' son read a statement at the hearing on behalf of his mother, he concluded the statement by asking the board "to remember that they are to decide whether or not the policies and procedures were followed. It's not a matter of whether Janet was fired, but whether the procedures were correctly followed." Id. at ¶ 161. Given that the issue was clearly placed before the board, and that the sole function of the board was to evaluate the mayor's decision, it can also be inferred either that, by voting to uphold the mayor's decision, the board interpreted the provision to mean that he had the power to dismiss, or, barring that, that the board joined with the mayor in terminating Judkins' employment. Either way, the mayor's action was approved.

### b. Procedural Due Process

Even assuming that (1) the disputed provision could give rise to a property interest recognized as a basis for relief under Section 1983, (2) the provision should be interpreted as Judkins asserts, and (3) the provision was in fact violated, Judkins' Section 1983 claim resting on this provision still fails because what she is then left with is a claim for deprivation of her due

process rights under the United States Constitution, and it is beyond dispute that she received sufficient due process, both pre-termination and post-termination, under the Constitution.

### i. *Judkins' Pre-termination Rights*

Once a property right arises, it is the duty of the court to decide what process, under the Constitution, is due before a plaintiff may be deprived of that right.[8] <u>Kingsford</u>, 247 F.3d at 1128. Under the federal Constitution, "a full evidentiary hearing is not required prior to an adverse employment action." <u>W. v. Grand Cnty.</u>, 967 F.2d 362, 367 (10th Cir. 1992) (citations omitted). Instead, due process only requires adequate "notice and an opportunity to respond," both of which should be "appropriate to the nature of the case." <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542, 546 (1985) (citing <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 313, (1950)).

Judkins asserts that she was entitled to a pre-termination hearing to give her "an opportunity to present her side of the story." (Dkt. No. 55, pp. 90–91.) She claims that she was entitled to a pre-termination hearing because such hearings are important in deciding "whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." <u>Id.</u>

While Judkins correctly recites one of the main purposes behind the need for a pre-termination hearing, there is no need for such a hearing here because Judkins was not terminated for cause. Indeed, "[d]ismissals for cause will often involve factual disputes," and a pre-termination hearing allows the employee some opportunity "to present his side of the case" to aid in "reaching an accurate decision." <u>Loudermill</u> 470 U.S. at 543 (where a pre-termination hearing was required when an employee was dismissed for cause regarding allegations of dishonest

---

[8] Accordingly, whether the particularities of Plain City's Code were actually followed is not relevant to this inquiry.

behavior); see Powell 891 F.2d 1454 (where a pre-termination hearing was required when a firefighter was dismissed for cause after allegedly endangering the safety of citizens); Therefore, a pre-termination hearing would not have been appropriate to the nature of this case. She had three days between when Mayor Judkins hand-delivered the termination letter to her and when her termination would become effective, and she admits she could have confronted the mayor during that time but chose to use the appeals process instead. (Dkt. 54-4, pp. 91–92); see also Powell v. Mikulecky, 891 F.2d 1454 (10th Cir. 1989) (where a face-to-face conversation constituted sufficient notice, and where the court held that an employee is not entitled to "pre-notification notice").

Even assuming that her pre-termination process was insufficient, any alleged deficiencies were more than compensated for by her two post-termination appeals, which are discussed next. The Court in Loudermill acknowledged this concept by noting that the acceptability of minimal pre-termination procedures rests "upon the provisions . . . for a full post-termination hearing." Melton v. city of Oklahoma city, 928 F.2d 920, 939 (10th Cir. 1991) (citing Loudermill 470 U.S. at 546).

### ii. Judkins' Post-termination Rights

Regarding her post-termination rights, Judkins claims that defendants deprived her of due process by violating the Code during her appeals process. Specifically, she claims that (1) the Code was violated during her first appeal because the Mayor was biased and allowed to choose two of the five Board members, (Dkt. No. 46, ¶ 42), and that (2) the Code was violated during her second appeal because she was not reinstated after the tie vote on October 6, 2011. (Dkt. No. 55, ¶ 205.)

As already noted, all claims of "due process under the Constitution are evaluated against basic federal constitutional standards," not by local policies and procedures. See Rector v. city & Cnty. of Denver, 348 F.3d 935, 947 (10th Cir. 2003). Thus, her second claim fails because under constitutional standards Judkins had a right to only one post-termination hearing and any complaint about her second hearing is irrelevant for purposes of due process. See Loudermill, 470 U.S. 532. Furthermore, she received sufficient due process during her first hearing, and the rights she enjoyed during this hearing are not in dispute. Specifically, she received notice of the hearing and had adequate time to prepare. (Dkt. 55. ¶¶ 120–125.) She was allowed to speak at the hearing, but she chose to present a written statement instead, which her son read on her behalf. Id. at ¶ 128. Finally, she could have had counsel present, although she chose not to, and she could have presented witnesses. Id. at ¶¶ 120–125. See Bailey v. Kirk, 777 F.2d 567, 577–78 (10th Cir. 1985) (noting that a court must balance a "plaintiff's interest in employment against the city's important interest in efficient functioning of the city machinery which may be impeded by imposing a requirement of adversarial, trial-like hearings for every disciplined employee.") Notwithstanding, in the end the appeals board still voted four to one to uphold her dismissal.

Regarding her claim of bias, Tenth Circuit law is clear that "an impartial tribunal is an essential element of a due process hearing." Bailey v. Kirk, 777 F.2d 567, 576 (10th Cir. 1985). However, a plaintiff must make a "substantial showing of bias to establish that the hearing was unfair and thus violated due process." Id. (citations omitted); see also Staton v. Mayes, 552 F.2d 908, 913 (10th Cir. 1977). Here, Judkins has not made a "substantial showing" that the appeals board was biased, nor does she create any related issues of fact. She simply makes the conclusory allegation that the appeals board was biased based solely on the fact that the mayor chose two of its five members. However, this setup was approved by an ordinance duly passed

by the city council.[9]  See (Dkt. No. 54-19).  Further, Judkins neglects to note that LaFray Kelley—the only person on the five-person board who voted in her favor—was chosen by the mayor, nor that there is evidence that Kelley was actually biased in Judkins' favor.[10]  Finally, Judkins' reference to <u>Staton v. Mayes</u> is unhelpful because, unlike Judkins, the plaintiff in that case made a substantial showing that the tribunal was biased.[11]  552 F.2d 908 (10th Cir. 1977).

---

[9] City ordinance 3.1.150(f) states, "the appeal board . . . shall consist of five members, three of whom shall be chosen by and from employees and two of who [sic] shall be members of the governing body."  Because Plain City had never dealt with an employee appeal, the city had not yet established the method for choosing these five members.  The ordinance goes on to say,

> *The method and manner of choosing members of the appeal board, and designation of their terms of office shall be prescribed by the governing body by ordinance*, but the provisions for choosing the three members from the appointed officers and employees shall in no way restrict a free selection of members by the appointive officers and employees of the municipality.

(Dkt. No. 55, ¶ 115.) (emphasis added).  The council soon adopted another ordinance establishing the method for choosing the five members.   The ordinance was named, "Establishing Procedures to Form a Discharge Appeal Board and Establishing an Effective Date."  Id. at ¶ 116.  The ordinance stated that two members would be chosen by the mayor from among the city council, and the other three members would be chosen by city employees from among city employees.  Id.

[10] Judkins testified that Kelley is Mayor Jenkins' cousin, and that the two do not get along. (Dkt. 45-4, pp. 15–16) (excerpts from Judkins' deposition).  She also testified that Kelley gave her funds to assist in paying for this lawsuit on two occasions for a total of $1000.  Id. at pp. 9–11.  She testified that Kelley reviewed the complaint in this lawsuit before it was filed, commented on it, and approved of it.  Id. at p. 11.  According to Judkins, Kelley advised her about city policies and how to handle her first appeal and also that Kelley told her that she believed Mayor Jenkins was wrong.  Id. at 16.

[11] The plaintiff in <u>Staton</u> provided clear evidence that three of the tribunal members were biased: two had admitted to certain biased conversations prior to the hearing, and one had even made public statements during his re-election campaign to the local school board promising that he would dismiss the plaintiff.  Id. at 913.  In other words, there was clear evidence that the tribunal members had already committed to a course of action before evaluating the evidence.

### c. Plain City and Mayor Jenkins Are Not Liable Under Section 1983

Even assuming that Judkins had a recognized property interest, and also that the

defendants then violated her constitutional right to due process, both the city and the mayor are

immune from Judkins' 1983 claims.

Regarding Plain City, for a municipality to be liable, the plaintiff must show it was the

municipality's "policy or custom" that caused the alleged deprivation. See Brammer-Hoelter v.

Twin Peaks Charter Acad., 602 F.3d 1175, 1188-89 (10th Cir. 2010). This can be shown if the

deprivation is caused by someone with final "policymaking" authority. Id. In Pembaur v.

Cincinnati, the Supreme Court explained that:

> "[t]he fact that a particular official—even a policymaking official—has discretion in the
> exercise of particular functions does not, without more, give rise to municipal liability
> based on an exercise of that discretion. . . . *The official must also be responsible for
> establishing final government policy respecting such activity* before the municipality can
> be held liable.

475 U.S. 469, 482-83 (1986) (emphasis added). Mayor Jenkins does not have "final

policymaking authority." That authority belongs to the city council, which is demonstrated by

the fact that the mayor cannot vote except to break a tie vote in the council, and the council may

postpone an action that initially results in a tie, which it did when the second appeal resulted in a

tie on October 6, 2011. (Dkt. No. 55, ¶¶ 12-14.)

Regarding Mayor Jenkins, public officials are entitled to qualified immunity, which

shields them from Section 1983 liability, unless their conduct violates clearly established

statutory or constitutional rights of which a reasonable person would have known. See Harlow

v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, a public official can only be liable if the

right is so established that "a reasonable official would understand that what he [was] doing

violate[d] that right," Anderson v. Creighton, 483 U.S. 635, 640 (1987). The plaintiff bears the

burden of showing both (1) that the law was clearly established at the time of the defendant's alleged conduct, and (2) that the alleged conduct also violated the law. Pueblo Neighborhood Health Centers, Inc., v. Losavio, 847 F.2d 642, 645 (10th Cir.1988)

Judkins has failed to meet this burden here. As already discussed, the provisions of the Code that Jenkins allegedly violated were not clearly established because they were ambiguous. Additionally, none of defendants' conduct violated "clearly established" constitutional principles because their actions did not violate due process. Thus, Judkins has not carried her burden of showing that Jenkins' conduct violated clearly established statutory or constitutional rights and Jenkins is entitled to judgment as a matter of law on the issue of qualified immunity. See Powell, 891 F.2d at 1458.

### III. TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS—AND INTENTIONAL/NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Judkins asserts in her complaint that Jenkins deliberately interfered with her appeal rights and in so doing tortiously interfered with her economic relations. See Am. Compl. 11. She also claims that defendants "intentionally and/or negligently inflicted emotional distress" on her. Id. at 10. Regarding tortious interference, this claim fails because Judkins does not cite any applicable law or even attempt to address the required elements of a successful claim. Regarding intentional infliction of emotional distress, this claim also fails because the facts of this case do not approximate the type of flagrant conduct by employers that is required under the law. See Franco v. The Church of Jesus Christ of Latter-day Saints, P.3d 198, 207 (Utah 2001) (noting that "[t]he conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair."); Bennett v. Jones, Waldo, Holbrook & McDonough, 70 P.3d 17, 30 (Utah 2003) (stating that the defendant's actions must be "of such a nature as to be considered outrageous and

intolerable in that they offend against the generally accepted standards of decency and morality").

## IV.  THE NEGLIGENCE/NEGLIGENCE PER SE CLAIM

Judkins "Negligence/Negligence Per Se" claim is based on her assertion that defendants breached a duty to her "through inaction and delay, and/or failure to follow the procedures written in the Policies and Procedures manual."  See Am. Compl. 10.  However, this claim is specifically barred by the UGIA.  The UGIA states that a municipality is not liable for "any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment" if "the injury arises out of, in connection with, or results from: . . . abuse of process . . . deceit, interference with contract rights, . . . or violation of civil rights."  Utah Code Ann. § 63G-7-301.

The facts here fall under this category because the alleged negligence essentially resulted from what was, at most, an "abuse of process."  In fact, although not dispositive, Judkins testified that defendants' alleged breach of duty related to the "process and recourse available" to her after she was terminated, and that the reason she pursued her appeals was because "they did not follow the policies outlined in the Plain city Administrative Policies and Procedures."  (Dkt. No. 45, ¶¶ 109, 130.)  Accordingly, the UGIA bars Judkins' Negligence/Negligence Per se claim.

## V.  THE TITLE VII GENDER DISCRIMINATION CLAIM

A plaintiff in a Title VII gender discrimination claim has the burden of establishing prima facie case.  To do so, the plaintiff must show: (1) that she is a member of a protected category; (2) that she was otherwise qualified for the position at issue and was performing her job in a satisfactory manner; (3) that an adverse action was taken against her; and (4) that a similarly

situated person outside the protected class was treated differently than she was treated.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

Judkins fails to establish a prima facie case of gender discrimination because she cannot show that a similarly situated person outside the protected class was treated differently than she. The only person she identifies who was outside the protected class—i.e., who was not female—was city employee Dusty Palmer.  (Dkt. No. 46, ¶¶ 99–100.) (Dkt. No. 2-3, ¶ 102.)  However, Palmer only cleaned the senior center during the interim before M&V took over, and he clearly did not receive Judkins' job or title; he simply served briefly to allow M&V to coordinate its resources and eventually take over the job.  See (Dkt. No. 55, ¶¶ 100, 182, 185.)   Regarding her scheduling duties, Judkins cannot identify a similarly situated person outside of the protected class because the employees who assumed her scheduling duties were female. (Dkt. No. 55, ¶ 24.) Accordingly, Judkins has not met her initial burden to present a prima facie case.

However, even assuming she could establish a prima facie case, defendants are only required to respond with a legitimate, nondiscriminatory reason for their actions.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252–53 (1981).  Here, defendants have done so. They claim Judkins' scheduling duties were given to the front desk to prevent mistakes in coordinating scheduling and payments, and her cleaning duties were given to M&V to consolidate cleaning functions.  It is undisputed that M&V was already cleaning the upper level as well as stripping and waxing the senior center floors.  (Dkt. 45, ¶¶ 4, 31, 34, 87–88, 100.)

Having alleged a legitimate basis, the burden of proof returns to the plaintiff, who must present proof by a preponderance of the evidence that defendants' articulated reasons were only a pretext for discrimination.  In other words, she would need to show both that "the reason was false, and that discrimination was the real reason."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502,

515 (1993) (citations omitted).  She has not come forward with sufficient evidence from which a jury could reasonably decide she was discriminated against on the basis of her gender.  Accordingly, summary judgment is appropriate in favor of defendants.

## CONCLUSION

In this case, plaintiff Judkins, a long-time part time city employee, was suddenly and unexpectedly relieved of her job duties by Mayor Jenkins.  She clearly felt that she was poorly and unfairly treated by his actions.

In the immediate aftermath of her dismissal, she sought and received an initial appeal to the city council.  Accordingly, a special appeals panel was created to hear her claims.  Simultaneously, she sought relief from the UALD and the EEOC, asserting claims of various forms of discrimination.

After the first appeal resulted in a decision to uphold the mayor's action, she sought and was granted a second appeal, this time to the city council itself.  The final result was again against her.

In this lawsuit Ms. Judkins seeks relief based on claims of (1) retaliation for her alleged whistleblowing actions pursuant to the Utah Protection of Public Employees Act, (2) gender discrimination pursuant to Title VII of the Civil Rights Act, (3) deprivation of property rights protected by Section 1983 of Title 42 of the United States Code, and (4) a number of additional state law claims.  The retaliation claim fails because it was not filed within the time limitation set forth in the act.  Her gender discrimination claim fails for lack of sufficient facts to permit her case to go to a jury.  And her Section 1983 claims fail because she has not identified the loss of a protected property right and, even if she has, the record clearly shows her due process rights were adequately provided.

The court is sympathetic to Ms. Judkins' obvious belief that she was improperly dealt with.  However, based on the foregoing discussion, the court cannot find among her legal claims any that would qualify to proceed to a trial.  Accordingly, the court GRANTS defendants Jay Jenkins' and Plain City's motion for summary judgment and DENIES plaintiff Janet Judkins' motion for summary judgment.

DATED this 7th day of February, 2014.

_____

Honorable Judge Dee Benson